**OFFICE OF COMMUNICATION OF THE UNITED CHURCH OF CHRIST, Aaron Henry, Robert L. T. Smith, and United Church of Christ at Tougaloo, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**Lamar Life Broadcasting Company, Intervenor.**

**No. 19409.**

United States Court of Appeals District of Columbia Circuit.

Reargued Feb. 18, 1969.

Decided June 20, 1969.

Rehearing En Banc Denied Sept. 5, 1969.

**544**

Mr. Earle K. Moore, New York City (except for Aaron Henry, On Rehearing), with whom Mr. Henry F. Lerch, Washington, D. C., and Mrs. Ann Aldrich, Cleveland, Ohio, were on the brief, for appellants.

Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, Federal Communications Commission, were on the brief, for appellee. Mr. Howard J. Braun, Counsel, Federal Communications Commission at the time the record was filed, also entered an appearance for appellee.

Mr. Paul A. Porter, Washington, D. C., with whom Mr. Reed Miller, Dennis G. Lyons and Robert D. Rosenbaum, Washington, D. C., was on the brief, for intervenor.

Messrs. Peter L. Koff and Lawrence Speiser, Washington, D. C., filed a brief on behalf of American Civil Liberties Union as amicus curiae urging reversal.

Before BURGER, MCGOWAN and TAMM, Circuit Judges.

BURGER, Circuit Judge:

This case returns to the Court again after hearings held pursuant to an earlier opinion of this Court in which we directed that intervenors representing segments of the licensee's listening public were to be permitted to intervene and participate.[1] No additional intervenors thereafter sought to take part in the Commission proceedings.[2]

The action of this Court in remanding for hearings with listening-public intervenors taking part followed the Commission's 1965 action which granted the licensee a "probationary" one year license.[3] This unusual Commission action underscored that in the proceedings involving the application for a three-year renewal (from 1964 to 1967) the Commission had not been able to conclude that the licensee met the burden of showing that renewal of its license for three years was in the public interest.

---

1. Office of Communication of the United Church of Christ v. FCC, 123 U.S.App. D.C. 328, 359 F.2d 994 (1966).

2. The fact that no additional intervenors brought their case to the Commission substantiates our earlier observation that:
   The fears of regulatory agencies that their process will be inundated by expansion of standing criteria are rarely borne out. Always a restraining factor is the expense of participation in the administrative process, an economic reality which will operate to limit the number of those who will seek partici-pation; legal and related expenses of administrative proceedings are such that even those with large economic interests find the cost burdensome. Moreover, the listening public seeking intervention in a license renewal proceeding cannot attract lawyers to represent their cause by the prospect of lucrative contingent fees, as can be done, for example, in rate cases.
   Church of Christ, *supra* note 1 at 340, 359 F.2d at 1006.

3. Lamar Life Broadcasting Co., 38 F.C.C. 1143 (1965).

Following various complaints filed with it, in 1962 the Commission had initiated its own field investigation into the programming operations of certain Mississippi broadcast stations, including WLBT. This investigation precipitated a July 25, 1963, letter from the Commission requesting the licensee's comments on listed questions as to its programming policies and set forth some of the specific findings of the field investigation on these matters. The Commission's consideration of WLBT's reply was pending when the licensee filed an application for renewal of its license for the June 1, 1964 to June 1, 1967 period.

In reviewing these responses prior to its award of the one-year probationary grant, the Commission noted, *inter alia*:

> The question is rather whether the licensee complied with the requirements of the fairness doctrine—i. e., whether, having presented one side of a controversial issue of public importance, it sought affirmatively to encourage and implement the presentation of contrasting viewpoints. *The licensee's response is not fully satisfactory in this respect.*
>
> \*　\*　\*　\*　\*　\*
>
> In short, when a fairness complaint is made, a licensee relying upon network programs to balance local broadcasts has the burden of demonstrating that the network shows carried by it did present contrasting viewpoints to those expressed in the local broadcasts. *That showing has not been made here.*

Lamar Life Broadcasting Co., *supra* note 3 at 1146, 1147–1148 (emphasis added).

Moreover, in setting forth the specific conditions attached to its one-year probationary award, the Commission provided:

> (iv) *That the licensee immediately cease discriminatory programming patterns.* Thus, it is up to the licensee to make the programming judgment whether or not to have a daily 1-minute devotional program at noon, in which appearances are rotated among the area churches in the area on the basis of race. Such a practice is obviously inconsistent with the public interest; indeed, we note that the licensee does not try to defend it.

*Id.* at 1154 (emphasis added).

In discussing the Commission's action we noted that the Commission had found that the licensee's prior conduct prevented the grant of a full term license.[4]

■ When the matter was again before the Commission on our remand, therefore, it was in a posture that the licensee had yet to demonstrate that it was in the public interest for the license to be renewed. This was a less favorable posture for the licensee than would have been the case absent the "probationary license" grant. This is important, but its significance seems to have eluded the hearing Examiner and the Commission as well; we emphasize this now to remove any lingering doubts as to our evaluation of a "probationary" grant —a grant which by its nature assumes that the renewal-licensee has been unable to persuade the Commission that it is presently in the public interest to grant a three-year renewal. That the Examiner failed to grasp this fact is reflected throughout his report and noticeably in his statement that

> grant of the one-year license on the policy ground that there was an urgent need at the time for a properly run station in Jackson must have been predicated on a belief that the need was so great as to warrant the risk that WLBT might continue its improper conduct.

Church of Christ, *supra* note 1 at 341, 359 F.2d at 1007.

---

4. At that time we observed:

> The Commission in this Court argues that it accepted all Appellant's allegations of WLBT's misconduct and that for this reason no hearing was necessary. Yet the Commission recognized that WLBT's past behavior, as described by Appellants, would preclude the statutory finding of public interest necessary for license renewal; hence its

"the evidentiary hearing * * * presented [Appellants] ample and sufficient opportunity to come forward and *sustain their serious allegations* that they had made against the applicant. They have woefully failed to do so * * *."

Lamar Life Broadcasting Co., 14 F.C.C. 2d 495, 549 (1967) (emphasis added).

Since the Commission itself had previously found that some of these "serious allegations" were sufficient to withhold the grant of the traditional three-year license, the Examiner's approach, and its subsequent adoption by the Commission, signifies an attitude considerably at odds with the Commission's earlier action in refusing a three-year license. The Examiner seems to have regarded Appellants as "plaintiffs" and the licensee as "defendant," with

burdens of proof allocated accordingly. This tack, though possibly fostered by the Commission's own action,[5] was a grave misreading of our holding on this question.[6] We did not intend that intervenors representing a public interest be treated as interlopers. Rather, if analogues can be useful, a "Public Intervenor" who is seeking no license or private right is, in this context, more nearly like a complaining witness who presents evidence to police or a prosecutor whose duty it is to conduct an affirmative and objective investigation of all the facts and to pursue his prosecutorial or regulatory function if there is probable cause to believe a violation has occurred.

This was all the more true here because prior to the efforts of the actively participating intervenors, the Commission itself had long since found the li-

---

5. In setting the hearing following our remand, the Commission, on May 26, 1966, designated the hearing issues to be:

    (a) Whether station WLBT has afforded reasonable opportunity for the discussion of conflicting views on issues of public importance;

    (b) Whether station WLBT has afforded reasonable opportunity for the use of its broadcasting facilities by the significant groups comprising the community of its service area;

    (c) Whether station WLBT has acted in good faith with respect to the presentation of programs dealing with the issue of racial discrimination, and, particularly, whether it has misrepresented to the public or the Commission with respect to the presentation of such programming.

    (d) Whether in light of all the evidence a grant of the application for renewal of license of Station WLBT would serve the public interest, convenience, or necessity.

In the designation Order, the Commission explained:

10. Pursuant to the rule announced in *D & E Broadcasting Company*, 1 FCC 2d 78 (1965), and in accordance with the statutory mandate of Section 309 (e), the burden of proof as to issues (a) and (b) shall be upon the intervenors, the burden of proof as to issue (c) shall be upon the Broadcast Bureau, and the burden of proof as to issue (d) shall be upon the applicant.

Lamar Life Broadcasting Co., 3 F.C.C.2d 784 (1966).

6. Prior to the initiation of the evidentiary hearing we denied Appellants' motion for clarification of our earlier opinion; however, in a memorandum statement accompanying the denial we noted:

In our view it should not be necessary, and certainly is not desirable, for this court to supervise the details of conduct of hearings before the Commission by the device of periodic revision of the language used in opinions. Only the most extraordinary circumstances would warrant our intervention by this means; such circumstances do not exist here inasmuch as, in respect of paragraphs 9 and 10, respectively, of the Commission's order released May 25, 1966, *we assume that* (1) the Commission's concept of evidence of past performance which, in its words, "is not unduly remote in time" is commensurate with what was, in our words, "a history of programming misconduct of the kind alleged" occasioning our remand, and (2) *the Commission's reference to "the burden of proof" in respect of issues (a), (b), and (c) is intended to mean only the burden of going forward with evidence in the first instance.*

Church of Christ, No. 19,409 (D.C. Cir., Filed November 18, 1966) (emphasis added).

censee wanting.[7] It was not the correct role of the Examiner or the Commission to sit back and simply provide a forum for the intervenors; the Commission's duties did not end by allowing Appellants to intervene; its duties began at that stage.

A curious neutrality-in-favor-of-the-licensee seems to have guided the Examiner in his conduct of the evidentiary hearing. An example of this is found in his reaction to evidence of a monitoring study conducted by Appellants for about one week in 1964 and which was the subject of two days of testimony at the hearing. The Examiner's conclusion was that the play-back had "virtually no meaning for the simple reason that it was * * * fair and equitable. [It] is worthless and therefore *completely discounted* for any consideration by the hearing examiner." 14 F.C.C. 2d at 543 (emphasis added). In context

or out, this reaction is difficult to comprehend.[8] The Commission has often complained—and no doubt justifiably so —that it cannot monitor licensees in any meaningful way; here a 7-day monitoring, made at no public expense, was presented by a public interest intervenor and was dismissed as "worthless" by the Commission.

■ Concerning the cutting off of a network program relied on by Intervenors as showing violations of the Fairness Doctrine the Examiner found: "There is not one iota of evidence in the record that supports any such allegation." Yet in the transcript of proceedings we find testimony identifying the program which was admittedly cut off. The record shows the following:

Q. Did you recognize the lunch counter?

A. I recognized the Woolworth Counter where the demonstration oc-

---

7. In connection with WLBT's 1959 renewal applications, the Commission had found specific failures to comply with the demands of the Fairness Doctrine, but did not withhold a renewal on the grounds that they were "isolated violations." See Lamar Life Broadcasting Co., *supra* note 3 at 1145.

8. The following excerpts from the hearing transcript illustrate the licensee's success in placing an unrealistic burden on the Intervenors. Mrs. Elizabeth Ewing, who prepared the monitoring study exhibits on behalf of Appellants, was the witness:

Q. Could you tell from the tape whether the news of, well say, Dick Sanders, whether he was reading from United Press International wirecopy? Do you know what that is?

A. Yes.

Q. Could you tell whether he was reading from UPI wirecopy or from a transcript that he, himself, had prepared?

A. No.

Q. Did you make any identifications where the source of information was coming from?

A. No.

* * * * *

Q. Have you ever lived in Jackson, Mississippi?

A. No, I have not.

Q. Did you receive any instructions as to what would be of interest to the people in Jackson, Mississippi?

A. No.

Q. Did you study any documents or books or papers to find out what would be of interest to the people in Jackson, Mississippi?

A. No.

Q. Did you read Jackson newspapers during this period in March 1964?

A. No.

* * * * *

Q. Do you know whether or not Dick Sanders was quoting a press release from the Department of Justice?

A. No.

Q. Do you know whether he was quoting directly from the wire service?

A. No, I don't.

Joint Appendix 172, 183–184, 187 [hereinafter J.A.].

This witness had already produced evidence of the contents of the monitored broadcasts, yet she was pursued to ascertain the *source* of these programs—the type of information particularly in the control and at the disposal of a broadcast licensee. In evaluating Mrs. Ewing's testimony, the Examiner pursued the same tack, discrediting the study and the testimonial evidence to support it without ever placing on the licensee the affirmative burden of producing evidence to establish either the true source of the programming materials or, as compared to that of Mrs. Ewing, its own sensitivity to the needs and interests of portions of its listening audience.

curred here and the picture immediately disappeared. I picked up the telephone and immediately called WLBT—

Q. With whom did you speak?

A. The man refused to identify himself. I did not identify myself. I said, "Did you cut that off because that showed those Negroes sitting in at Woolworth's in Jackson?" *The man said, "Yes."*

MR. GEORGE: *I object.* I may be anticipating but I will object to any statement as to the reply.

PRESIDING EXAMINER: *That is correct. We will sustain that portion of it. You can't quote some undisclosed person.*

*The portion of the answer is stricken where he was quoting some unidentified person which is sheer hearsay.*[9]

J.A. 720–21 (emphasis added).

On allegations that at least two of the licensee's commentators used disparaging terms with reference to Negroes there was testimony of listeners who said they heard these episodes; in his initial decision the Examiner noted that "[a]t least three of the [Appellants'] witnesses" so testified. Nevertheless, the Examiner chose to belittle this evidence:

Because of the conflicting testimony respecting Ellis [one of WLBT's commentators], there is no finding made as whether he did or did not use the word "nigger" or "negra". But the evidence is undisputed that Alon Bee did use the expressions "negra" or "nigger" at some indefinite time in the past while broadcasting over station WLBT. *A glaring weakness of the intervenors' evidence here is that, as in many of their allegations, they did not pinpoint specific times when certain events supposedly occurred, thereby unfairly depriving the applicant of an opportunity properly to rebut such allegations.*

9. Conceivably a licensee might be justified, in some circumstances, to decline to carry a program it regarded as inflammatory because of current tensions; if placed on

14 F.C.C.2d at 510 (emphasis added).

It is not our function to determine whether this would have supported a finding that the licensee had violated the Fairness Doctrine but the Examiner's erroneous concept of the burden of proof shows a failure to grasp the distinction between "allegations" and testimonial evidence, and prevented the development of a satisfactory record.

▮ The infinite potential of broadcasting to influence American life renders somewhat irrelevant the semantics of whether broadcasting is or is not to be described as a public utility. By whatever name or classification, broadcasters are temporary permittees—fiduciaries—of a great public resource and they must meet the highest standards which are embraced in the public interest concept. The Fairness Doctrine plays a very large role in assuring that the public resource granted to licensees at no cost will be used in the public interest. In short, we do not determine how the factors we have discussed should have been weighed by the Commission but only that they had some probative value and should have been considered. To borrow a phrase from the Examiner, his response manifests a "glaring weakness" in his grasp of the function and purpose of the hearing and the public duties of the Commission.

▮ We need not continue recitals from the record or examples of similar situations which shed light on the nature of the hearings; in our view the entire hearing was permeated by similar treatment of the efforts of the intervenors, and the pervasive impatience—if not hostility—of the Examiner is a constant factor which made fair and impartial consideration impossible. The Commission and the Examiners have an affirmative duty to assist in the development of a meaningful record which can serve as the basis for the evaluation of the licensee's performance of his duty to serve the public interest. The Public

that basis and reasonable exercise of such discretion presumably would be sustained by the Commission.

Intervenors, who were performing a public service under a mandate of this court, were entitled to a more hospitable reception in the performance of that function. As we view the record the Examiner tended to impede the exploration of the very issues which we would reasonably expect the Commission itself would have initiated; an ally was regarded as an opponent.

The Commission, except as modified on some minor points, adopted the Examiner's Initial Decision: "[W]e are in agreement with the examiner's conclusions that the intervenors failed to corroborate or substantiate virtually all of their allegations upon which the hearing was predicated * * *." Lamar Life Broadcasting Co., 14 F.C.C.2d 431, 433 (1968). In a footnote to this resolution, the Commission notes:

> 8. Since our decision is based on the preponderance of evidence adduced at the hearing, we are of the opinion that the intervenors' argument that they only had the burden of going forward with evidence in the first instance on hearing issues (a) and (b), that the Broadcast Bureau only had the burden of going forward on issue (c), and that the station had the actual burden of proof on those issues, is mooted.

In this respect, we think it important to set forth what the trial Examiner understood the burdens of proof to be, for his understanding on this point profoundly affected his crediting or dismissing what was in essence *testimonial evidence* although he constantly characterized the evidence as "allegations":

> MR. MOORE [Counsel for appellants]: * * * I just want to state for the record that as I understand the burden of proof, the burden of proof on all issues ·is on the station and the only burden on the applicant [sic; should be intervenors] and the Bureau is the burden of going forward.

That is my understanding of the interpretation which has been placed on the Commission's order by the Court of Appeals.

> PRESIDING EXAMINER: No, that is not my interpretation. My interpretation is, by the Commission action, is *that the burden of proof is primarily upon the intervenors* on issues A and B, on the Broadcast Bureau on C and on the applicant on D, and you can't by waving the magic wand, shift the burden of proof to this applicant or to the Bureau.

J.A. 304–305 (emphasis added).

That this concept of the allocation of the burden of proof permeated the Commission's final resolution can be seen in its constant references to the Public Intervenor's failure to "prove" its "charges". As the Commission noted in closing: "We only conclude that the intervenors have failed to prove their charges and that the preponderance of the evidence before us establishes that WLBT has afforded reasonable opportunity for the use of its facilities by the significant community groups comprising its service area." 14 F.C.C.2d at 437–438. Once again we see the pervasiveness of the original error in confusing mere "allegations" and testimonial evidence—evidence which if not contradicted by the licensee's evidence, or on its face incredible, was entitled to carry the day in terms of establishing the point to which it was directed.

The Examiner and the Commission appear to have overlooked the 1965 Memorandum Opinion and Order of the Commission which contains much to the contrary to its present position;[10] moreover, the practical effect of the Commission's action was to place on the Public Intervenors the entire burden of showing that the licensee was not qualified to be granted a renewal. The Examiner and the Commission exhibited at best a reluctant tolerance of this court's mandate [11] and at worst a profound hostility to the participation of

10. *See* note 4 *supra.*

11. *See* note 6 *supra.*

the Public Intervenors and their efforts.[12]

The record now before us leaves us with a profound concern over the entire handling of this case following the remand to the Commission. The impatience with the Public Intervenors, the hostility toward their efforts to satisfy a surprisingly strict standard of proof, plain errors in rulings and findings lead us, albeit reluctantly, to the conclusion that it will serve no useful purpose to ask the Commission to reconsider the Examiner's actions and its own Decision and Order under a correct allocation of the burden of proof. The administrative conduct reflected in this record is beyond repair.

The Commission itself, with more specific documentation of the licensee's shortcomings than it had in 1965 has now found virtues in the licensee which it was unable to perceive in 1965 and now finds the grant of a full three-year license to be in the public interest.

■ We are compelled to hold, on the whole record, that the Commission's conclusion is not supported by substantial evidence. For this reason the grant of a license must be vacated forthwith and the Commission is directed to invite applications to be filed for the license.

We do refrain, however, from holding that the licensee be declared disqualified from filing a new application; the conduct of the hearing was not primarily the licensee's responsibility, although as the applicant it had the burden of proof. Moreover, the Commission necessarily did not address itself to the precise question of WLBT's qualifications to be an applicant in the new proceeding now ordered, and we hesitate to pass on this subject not considered by the Commission.

The Commission is directed to consider a plan for interim operation pending completion of its hearings; if it finds it in the public interest to permit the present licensee to carry on interim operations that alternative is available. The Commission is free to consider whether net earnings of the licensee should be impounded by the Commission pending final disposition of this license application.[13]

Reversed and remanded for further proceedings in accordance with this opinion.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges, in Chambers.

12. Two members of the Commission seemed to read the record much as we read it now. In a further statement filed by Commissioners Cox and Johnson in response to the majority's "further statement" in response to the original dissent, the dissenting Commissioners noted:

We remain perplexed by our colleagues' interpretation of the burden of proof issue, notwithstanding their attempt to further elucidate this problem in the further statement. As we noted in our dissenting opinion, the court of appeals clearly expressed its expectation that the Commission would resolve the problem by placing upon petitioners [Public Interest Intervenors] "only the burden of going forward with evidence in the first instance." By the strictures of the Communications Act of 1934, it is the licensee who is obligated to prove that renewal of his license is in the public interest, convenience, or necessity.

Our colleagues maintain that, "neither the burden of going forward with the evidence nor the burden of nonpersuasion [is] * * * discharged by the party on whom it may fall by the simple making of charges and/or allegations." Needless to say, we have not suggested that "simple charges and/or allegations" are adequate. However, under their construction, it almost seems that presumptions favoring the licensee arise as to each of the issues contained in the pleadings; and, thus, as to the ultimate issue of public interest. This rule of procedure is plainly unjust and flatly contradictory of the court's memorandum respecting the burden of proof questions, a fact noted in our dissent and not disputed by the further statement.

Lamar Life Broadcasting Co., 14 F.C.C. 2d 431, 487 (1968).

13. We are aware that in the ordinary course the license granted by the Commission would expire on June 1, 1970.

On Petitions for Rehearing or
Clarification and Suggestions
for Rehearing en banc

## ORDER

PER CURIAM.

On consideration of the petitions filed herein by counsel for the Federal Communications Commission and intervenor, Lamar Life Broadcasting Company, for rehearing, for clarification of the Court's opinion and of the suggestions for rehearing *en banc*, it is

Ordered by the Court, insofar as the aforesaid petitions are directed to the assigned division of this Court, that said petitions be denied, and it is

Further ordered by the Court *en banc*, there not being a majority of the judges of this circuit in favor of having this case reheard by the Court sitting *en banc* that the suggestions for *en banc* hearing are denied.

STATEMENT OF JUDGES McGOWAN AND TAMM ACCOMPANYING VOTE TO DENY THE PETITION OF THE FEDERAL COMMUNICATIONS COMMISSION FOR REHEARING BY THE PANEL OR EN BANC.

The essential conclusion of the division which heard this case was that the record compiled upon remand was, because of the misconceptions of the Trial Examiner, in no state to admit of an informed and reliable finding as to whether the renewal sought was in the public interest. Since the licensee has not in over six years established its right to continue to be entrusted with this valuable public asset, the opinion understandably expressed some impatience with this state of affairs, although it recognized that the ineptitude of the Commission was as much, if not more, to blame for this scandalous delay than was the licensee. For this reason, the division was not disposed to declare the licensee ineligible to seek new authority to use the channel. It did think that the licensee should compete for that authority, on even terms as nearly as may be, with any other applicant.

The Commission professes concern that the court has improperly arrogated to itself a decision which assertedly is committed only to the Commission, namely, the denial of the license renewal application because the licensee is not qualified under any circumstances, in terms of the public interest, to have the channel. Had that been the division's purpose, it would not have contemplated that the licensee could be one of the competing applicants. What was held was that the proceedings on remand had been hopelessly bungled and that the public interest was best served by taking note of the early expiration date * and getting on with a new hearing in which the Commission can decide who is best qualified to have this channel. The Commission knows full well how to do this under its existing powers, without interruption of the present service if that is deemed important and on such terms as it thinks fit.

The Commission points to the provision of 47 U.S.C. § 307(d) to the effect that, pending final disposition of a renewal application, the Commission "shall continue such license in effect." It says that this means that the licensee seeking renewal must be regarded as having continuing authority until its application has been finally disposed of adversely to it—and this last, so it is said, only the Commission can do. It is doubtful if Congress intended that a licensee should be able to remain in possession indefinitely merely because the Commission proves unable or unwilling to conduct proceedings which will survive judicial scrutiny. A licensee holding over on any such basis is, at best, a licensee in name only, and it is presumably in such light that the licensee here involved will take its place among competing applicants.

---

* The license grant under review terminates June 1, 1970, and proceedings to determine who should be the licensee for the term beginning on that date would have to get under way in ample time before that.