495 So.2d 209 (1986)
ISLAND HARBOR BEACH CLUB, LTD., et al., Appellants,
v.
DEPARTMENT OF NATURAL RESOURCES, Appellee.
SUNSET REALTY CORPORATION, et al., Appellants,
v.
DEPARTMENT OF NATURAL RESOURCES, Appellee.
Nos. BE-352, BE-355.
District Court of Appeal of Florida, First District.
September 10, 1986.
*211 Kenneth G. Oertel, of Oertel & Hoffman, P.A., Tallahassee, for appellant Island Harbor Beach Club, Ltd.
Carlos Alvarez and Carolyn S. Raepple, of Hopping, Boyd, Green & Sams, Tallahassee, for appellant Sunset Realty Corp.
David Guest, Asst. Atty. Gen., Tallahassee, for appellee.
ZEHMER, Judge.
These appeals arise out of a 1984 proceeding initiated by the Department of Natural Resources (DNR) to amend rule 16B-26.06, Florida Administrative Code, for the purpose of reestablishing the coastal construction control line in Charlotte County pursuant to section 161.053(2), Florida Statutes (1983).[1] Appellants filed petitions challenging the validity of the proposed control line amendments pursuant to sections 120.54(4) and 120.56, Florida Statutes (1983). A formal administrative hearing lasting six days was held in November and December 1984, and on January 8, 1985, the hearing officer issued a final order finding the proposed rule establishing the new control line valid. Sunset Realty Corp., et al.,[2] and Island Harbor Beach Club, Ltd., et al.,[3] filed separate notices of appeal and the two cases have been consolidated for appellate purposes.
One of the issues raised on appeal urged that the hearing officer erred in failing to rule upon each proposed finding of fact submitted by appellants, as required by section 120.59(2), Florida Statutes (1983). *212 On October 10, 1985, we issued an opinion agreeing with that argument and temporarily relinquished jurisdiction to the hearing officer with directions to make rulings upon each of the proposed findings of fact. Island Harbor Beach Club, Ltd. v. Department of Natural Resources, 476 So.2d 1350 (Fla. 1st DCA 1985). Upon remand the parties submitted further arguments on the proposed findings of fact at hearing, and the hearing officer rendered extensive written rulings on all proposed findings of fact.[4] The parties then filed with this court supplemental briefs addressing new issues that arose as a result of the hearing officer's order on the proposed findings.
There presently remain nine issues raised by appellants on this appeal. For reasons hereafter discussed, we affirm the hearing officer's final order upholding the validity of the proposed rule reestablishing the coastal construction control line for Charlotte County.

I

STATUTORY PROVISIONS AND FACTS
Section 161.053(1), Florida Statutes (1983), declares that "the beaches in this state and the coastal barrier dunes adjacent to such beaches, by their nature, are subject to frequent and severe fluctuations and represent one of the most valuable natural resources of Florida." The statute further declares "that it is in the public interest to preserve and protect [the beaches and dunes] from imprudent construction which can jeopardize the stability of the beach-dune system, accelerate erosion, provide inadequate protection to upland structures, and endanger adjacent property and the beach-dune system." In furtherance of these findings, that section delegates to DNR the authority and responsibility to "establish coastal construction control lines on a county basis along the sand beaches of the state" fronting on the Gulf of Mexico and Atlantic Ocean. It also requires that such lines "shall be established so as to define that portion of the beach-dune system which is subject to severe fluctuations based on a 100-year storm surge, storm waves, or other predictable weather conditions."[5] In addition, that section directs DNR to "establish a segment or segments of a coastal construction control line further landward than the impact zone of a 100-year storm surge, provided such segment or segments do not extend beyond the landward toe of the coastal barrier dune structure that intercepts the 100-year storm surge." DNR is authorized in subsection 161.053(2) to establish such control lines for counties having sand beaches "only after it has been determined from a comprehensive engineering study and topographic survey that the establishment of such control lines is necessary for the protection of upland properties and the control of beach erosion." DNR is given discretion to review established control lines "after consideration of hydrographic and topographic data which indicates shoreline changes that render established coastal construction control lines to be ineffective for the purposes of this act." § 161.053(2), Fla. Stat. (1983).
In May 1974 DNR began collecting data along the Charlotte County coastline and in 1977 established the first coastal construction control line for the county. Pursuant to the review provision in section 161.053(2), DNR has undertaken to reestablish the control line in Charlotte County. In December 1982 DNR collected new beach and offshore profile data which indicated that the coastline had substantially fluctuated, accreting in some areas and eroding in others. In 1984 DNR initiated an administrative proceeding to amend rule 16B-26.06 to establish a proposed new control line *213 in Charlotte County which would be substantially landward of the 1977 line for most of its length.
Section 161.053(2) sets forth the following seven factors which must be considered by DNR in establishing a coastal construction control line: (1) "ground elevations in relation to historical storm and hurricane tides"; (2) "predicted maximum wave uprush"; (3) "beach and offshore ground contours"; (4) "the vegetation line"; (5) "erosion trends"; (6) "the dune or bluff line, if any exist"; and (7) "existing upland development." According to DNR's evidence, all seven factors were taken into consideration in preparing the beach-dune profiles for the coast of Charlotte County hereinafter discussed.
DNR experts testified that these seven statutory factors have been combined to a more compact form consisting of the following four "determining criteria for establishing the recommended position of the coastal construction control line": (1) the landward limit of penetration of the three-foot wave height during a 100-year storm event; (2) the landward limit of beach or dune erosion incident to a 100-year storm event; (3) the limit of the washover deposits incident to a 100-year storm event; and (4) the erosional trend over five years. (Petitioners' Exhibit 6, pp. 11-12.)
Using the above statutory and "determining criteria," DNR gathered data on the profile of onshore and offshore topography at sixty-eight range locations along the fourteen-mile Charlotte County coastline, each range being located at thousand-foot intervals. Historical data was then gathered on hurricanes in the area since 1900, and this data was used to calculate the predicted frequency of hurricanes and the probability curve for five different hurricane characteristics, i.e., hurricane track direction, radius to maximum winds, central pressure deficit, forward speed of translation, and track position. Using a storm surge computer model, with the above data as input, DNR simulated hurricanes and predicted an average storm surge level for a 100-year storm in Charlotte County. This predicted 100-year storm surge level was then input into another computer model known as the "Kriebel Erosion Model". This model calculated the anticipated erosion distance at each range location in the county during the predicted 100-year storm. The calculated erosion distance was then multiplied by a factor of 2.5 to account for overwash deposits and alongshore sediment transport not predicted by the model and, also, to reflect the calibration of the model from average erosion to erosion at the most severe point of impact based on observed historical data. The resultant beach erosion figure from the Kriebel model represented the landward limit of beach or dune erosion during a 100-year storm event.
The predicted 100-year storm surge level was also used by DNR to calculate the landward penetration of a three-foot wave during such 100-year storm. At each range location in Charlotte County, the proposed control line was located at the more landward point along the line set by the Kriebel Erosion Model or the line set by the landward penetration of the three-foot wave. The proposed control line at ranges 1 through 15 in Charlotte County resulted from the Kriebel Erosion Model, whereas the proposed control line at ranges 16 through 68 was established on the basis of the three-foot wave line.

II.

ISLAND HARBOR'S APPEAL
Island Harbor asserts some seven points challenging the hearing officer's order upholding the proposed rule amendment setting the new coastal construction control line. We discuss the arguments presented under each of its stated questions.

A.

WHETHER DNR'S JURISDICTION TO ADOPT A COASTAL CONSTRUCTION CONTROL LINE IS LIMITED TO THE BEACH-DUNE SYSTEM.
Island Harbor contends under this point that DNR's setting of the new control line in Charlotte County constitutes an invalid exercise of delegated legislative authority because the line was set using methodologies designed to identify all areas of the *214 coast subject to damage from a 100-year storm, rather than containing the line within the statutorily mandated "beach-dune system." It argues that DNR has taken a beach preservation statute and impermissibly transformed it into a flood zone construction code, thereby extending DNR's jurisdiction to "protect" the coast against improvident construction. It contends that DNR has improperly construed the statutory term "beach-dune system" to include any part of the coast that might be affected by a three-foot storm surge wave without regard to whether there are in fact beaches or dunes in the area impacted, whereas, under the statute as construed by Island Harbor, DNR's jurisdiction is limited to the beach face and the landward toe of coastal frontal dunes. Island Harbor concludes that if there is a reasonable doubt as to the existence of agency jurisdiction and authority, the further exercise of that authority should be arrested, citing State ex rel. Greenberg v. Florida State Board of Dentistry, 297 So.2d 628 (Fla. 1st DCA 1974), cert. dismissed, 300 So.2d 900 (Fla. 1974), and other cases.
Island Harbor points to certain statutory language and DNR's own rules in support of its contention that DNR has impermissibly extended its jurisdiction beyond that granted by statute. It explains that section 161.053(1) gives DNR authority to set coastal construction control lines only "along the sand beaches of the state," and that, had the legislature intended to establish a program to regulate construction in flood zone areas, then it would not have limited DNR's authority to counties having sand beaches. Island Harbor emphasizes that DNR has by rule already established definitions of "beach" and "dune" which relate to existing physical structures,[6] but that DNR has, in effect, amended these definitions by construing the term "beach-dune system" to encompass dunes presently nonexistent and which may or may not occur in the future.
We are not persuaded that DNR has misapplied the statutory concept of "beach-dune system" and exceeded its statutory jurisdiction. We conclude, after review of the pertinent language in the applicable statutory provisions and the testimony of record, that the statutory phrase "beach-dune system" is properly construed to mean that portion of the coast where there has been, or is expected to be over time and as a matter of natural occurrence, cyclical and dynamic emergence, destruction, and reemergence of beach and dune structures. This definition of the beach-dune system comes directly from the testimony presented during DNR's case in chief by Deborah Flack, Director of the Division of Beaches and Shores at DNR, and has been consistently applied by DNR in other cases. We approve this definition upon the principle that an agency's construction of the statute it is charged with administering should be given great weight and should not be overturned unless clearly erroneous. E.g., Department of Professional Regulation v. Durrani, 455 So.2d 515 (Fla. 1st DCA 1984). We are persuaded that DNR's construction is not clearly erroneous because the word "system" is a term which evidences a broader concept than would follow from the use of the words "beach" and "dune" independently. The definitions of "beach" and "dune" in DNR's rules are not an impediment to this construction of "beach-dune system." We agree with DNR that it is reasonable to conclude that addition of the word "system" creates an entirely different connotation than is intended by use of the singular words "beach" and "dune."
*215 Island Harbor also complains that another definition of beach-dune system given during Ms. Flack's testimony, i.e., "that geophysical area which is subject to severe fluctuations that could be anticipated in a 100-year storm event" (Vol. 2, p. 100), is inconsistent with the statutory purpose set forth in section 161.053, Florida Statute (1983). It says that this definition goes well beyond the language of the statute because it contains no reference to either beach or dune and fails to take into consideration whether the geophysical area subject to severe fluctuations is part of the actual "beach-dune system." Again, we find no basis for reversal in this argument. Section 161.053(1) sets forth the statutory purpose to preserve and protect "the beaches in this state and the coastal barrier dunes adjacent to such beaches," and we recognize that any definition of the beach-dune system cannot disregard the beaches and dunes. But neither DNR nor the hearing officer's order has done so in applying a definition of beach-dune system to the facts established in this record. While Ms. Flack's quoted statement is not, standing alone, a complete and adequate definition, neither is it, when read in context with the balance of her testimony, inconsistent with the statutory language. The 100-year storm event is one of several factors involved in the analysis, and the hearing officer found that "topographic maps showed dunes over virtually all of that part of the islands that is not actually beach face." (Rulings on Proposed Findings of Fact by Number, p. 4). Mrs. Flack's testimony must be understood as comprehending an area of land containing the dune structures shown by the evidence.
DNR presented competent, substantial evidence to support its determination that, at the very least, all of the land seaward of the proposed coastal construction control line is part of the beach-dune system of Charlotte County. DNR determined that dunes covered nearly all of the islands, and then it set the proposed control line on the assumption that most of the land mass of the barrier islands along the Charlotte County coast constitutes the beach-dune system. The hearing officer's original order found as follows:
Under conditions that have recently obtained in Charlotte County, sloping sand beaches climb from the water's edge to the toe of a more or less pronounced primary sand dune, behind which other dunes undulate in succession across the barrier islands to Lemon Bay or Gasparilla Sound, from which they are occasionally insulated by mangrove swamp. Vegetation over much of the islands, which vary from 200 to 2000 feet in width, attests to their present stability.
But chances are that a hurricane will in time strike, flattening the dunes, spreading the sand well inland everywhere, all the way across the islands in some places, and leaving a wide beach face without, in many places, any discernible dunes. Such a reconfiguration will ineluctably result from the major hurricane identified as the 100-year return storm.
Thereafter, under more favorable weather conditions, dunes will grow and reemerge, comprised of sand the Gulf gives back as well as the sand strewn across the island by the storm, unless surface impediments prevent. The cycle complete, dunes will again stand their erosion-damping vigil against the sea, a buffer protecting the mainland, as well as insular upland.
(Final Order, pp. 9-10)
Although the evidence may have been in sharp dispute, the hearing officer had competent and substantial evidence before him which supports his findings, and we are not, therefore, authorized to disturb them. § 120.68(10), Fla. Stat. (1983).

B.

WHETHER DNR'S METHODOLOGY BEARS NO REASONABLE RELATIONSHIP TO THE PURPOSE OF THE BEACH AND SHORE PRESERVATION ACT WITH REGARD TO THE SETTING OF COASTAL CONSTRUCTION CONTROL LINES.
Island Harbor argues under this point that methodologies used by DNR do *216 not bear a reasonable relationship to the purpose of section 161.053, Florida Statutes (1983), because the three-foot wave criterion was not limited to the statutorily mandated beach-dune system and because the Kriebel Erosion Model was modified with a "safety factor" that served to impermissibly extend the control line beyond that portion of the beach-dune system subject to severe fluctuations. This argument is premised on the legal principle that any agency regulation that purports to implement statutory authority must bear a reasonable relationship to the enabling legislation. Agrico. Chemical Co. v. Department of Environmental Regulation, 365 So.2d 759 (Fla. 1st DCA 1978), cert. denied, 376 So.2d 74 (Fla. 1979).
According to Island Harbor, DNR's use of the three-foot wave criterion in setting the control line bears no reasonable relationship to the statutory purpose of protecting the beach-dune system because the three-foot wave will invade farther inland where there are little or no dunes to be protected. According to Island Harbor, DNR's use of the three-foot wave can be explained by DNR's erroneous supposition that it is actually charged with setting a line to protect upland structures from flooding, rather than a line to protect the beach-dune system; and since the federal government uses the three-foot wave line for flood insurance purposes, that is apparently why it was adopted by DNR.
Additionally, Island Harbor contends that DNR's use of a 2.5 safety factor multiplier in conjunction with the Kriebel Erosion Model bears no reasonable relationship to the protection of the beach-dune system because use of the multiplier greatly exaggerates the effects of erosion during a 100-year storm.
Again we are not persuaded by these arguments, and conclude that use of the three-foot wave methodology bears a reasonable relationship to the purpose of section 161.053. Island Harbor's argument assumes that the three-foot wave was used by DNR to establish the extent of the "beach-dune system" in Charlotte County. In fact, however, the three-foot wave was not used to establish the extent of the beach-dune system; that was determined by the presence of dunes over nearly all the islands. Rather, the three-foot wave was used to determine what portion of the beach-dune system would be subject to severe fluctuations in the event of a 100-year storm. The three-foot wave criterion does not lack a reasonable relationship to the statutory purpose simply because a three-foot wave will invade farther inland where there are presently few, if any, dunes; it bears a reasonable relationship to the statutory purpose because the area covered by the three-foot wave is shown to be part of the dynamic cyclical beach-dune system.
With respect to DNR's use of the 2.5 multiplier factor on the Kriebel Erosion Model, the hearing officer found that use of the multiplier was justified in order to convert average erosion into erosion at the point of direct hit of a 100-year storm event. The hearing officer explained his findings as follows:
3. The erosion model was calibrated by comparing what the model predicted with what in fact occurred in Walton County when Eloise hit. Erosion along the affected coast was not uniform. Investigators determined that a distance inland 2.5 times as far as the average distance to which the dunes eroded described the limit to which 97 or 98% of erosion occurred. Conversely, only along 2 or 3% of the 25 mile stretch of coast in Walton County affected by Eloise did erosion penetrate further than 2.5 times the average penetration along the affected coast.
Dr. Chiu and others calibrated the erosion model so that it predicted the average erosion along an affected shoreline, obtaining this average by taking into account erosion at the periphery as well as erosion where the storm did its worst. In order, therefore, to use the model to "define that portion of the beach-dune system which is subject to severe fluctuations," the average generated by the model was multiplied by 2.5. DNR *217 looked at what a 100-year return storm would do to the beach and dunes at each range it examined in Charlotte County, assuming that was where the storm struck. The use of the 2.5 factor proceeds from the assumption of a direct hit (or more precisely, almost a direct hit, since multiplying by 2.5 yields only 97 or 98% of what the erosion will be, if there is a direct hit).
(Rulings on Proposed Findings of Fact by Number, pp. 4-5.) These findings are supported by competent, substantial evidence. Further, it appears from the record that DNR's use of the 2.5 multiplier is at least partially justified by the fact that the Kriebel model fails to take into account overwash deposits and alongshore sediment transport, and these factors tend to create more erosion than predicted by the Kriebel model. In light of these factors, and the necessity to convert average erosion under the Kriebel model into erosion at the point of a direct hit, we are unable to conclude that use of the multiplier bears no reasonable relationship to the purpose of section 161.053.

C.

WHETHER DNR HAS EXAGGERATED THE IMPACTS OF A 100-YEAR STORM IN CHARLOTTE COUNTY.
Island Harbor contends under this point that appellants' constitutional protection of due process was violated by DNR when it used, as an integral part of its methodology in determining the effects of a 100-year storm, a doctoral thesis on "static and dynamic wave setup" which is unproven and not accepted in the general scientific community. It says that this unproven thesis resulted in a calculated storm water elevation 1.5 feet higher than that determined by the Federal Emergency Management Agency. Proceeding from the premise that the "static and dynamic wave setup" is based on an unproven doctoral thesis unacceptable in the general scientific community, Island Harbor argues that it is similar to lie detector evidence in criminal cases, which is inadmissible because of its lack of acceptance in the scientific community as a reliable indicator of truth or falsity. Kaminski v. State, 63 So.2d 339 (Fla. 1953). Furthermore, Island Harbor argues, the agency's use of an unproven theoretical concept to exaggerate the storm surge elevation by 1.5 feet caused the control line to be placed more landward than it should have been, resulting in DNR's authority and powers being greatly extended beyond that authorized by statute and supported by the factual evidence in the record. This result, Island Harbor says, is contrary to the rule that all doubts regarding the scope of agency authority should be resolved against the agency, citing State ex rel. Greenberg v. Florida State Board of Dentistry, 297 So.2d 628 (Fla. 1st DCA 1974).[7]
We do not accept as correct Island Harbor's statements concerning the legal standard for permitting an agency to use new scientific methodology in administrative proceedings within its statutory charge. In this case, the legislature, without providing explicit definitions, used diverse scientific terms, criteria, and words of art in section 161.053 which are meaningless to the ordinary person in the absence of expert technical and scientific explanation. We conclude that the choice of a particular scientific technique or methodology to explain these statutory terms and establish the control line was intended to lie, by legislative design, with the expertise of the agency. The selection and use of new scientific methodology was a matter of agency discretion that should not be set aside absent a showing that the agency's action is either arbitrary, capricious, an abuse of discretion, or not reasonably related *218 to the statutory purpose. To this extent, therefore, we approve the federal standard for admissibility of scientific evidence in administrative proceedings, urged by DNR, as that standard accords great deference to the policy-making discretion and expertise of regulatory agencies. See e.g., Baltimore Gas and Electric Co. v. Natural Resources Defense Council, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983); Carstens v. Nuclear Regulatory Commission, 742 F.2d 1546 (D.C. Cir.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985).
In Carstens the petitioners challenged, inter alia, the Commission's methodology for predicting the likelihood of seismic activity in an area proposed for a nuclear reactor, arguing that "the uncertainty of the science of seismology" required the Commission to adopt a more conservative methodology. Responding to this argument, the court said:
In advancing this argument, petitioners fundamentally misperceive the judiciary's role in complex regulatory matters. The uncertainty of the science of earthquake prediction only serves to emphasize the limitations of judicial review and the need for greater deference to policymaking entities. This is no startling or novel development. Just last year the Supreme Court in an analogous context observed that `[a] reviewing court must remember that the Commission is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.' Baltimore Gas & Electric Co. v. Natural Resources Defense Council, supra, 462 U.S. at [103], 103 S.Ct. at 2255.
742 F.2d at 1557.
This federal standard is consistent with the general rule in Florida that an agency's exercise of delegated legislative authority will not be disturbed on appeal unless shown by a preponderance of the evidence to be arbitrary, capricious, or an abuse of administrative discretion. Agrico Chemical Co. v. Department of Environmental Regulation, 365 So.2d 759 (Fla. 1st DCA 1979). See generally, 1 Fla. Jur. 2d, Administrative Law, § 41.[8]
The record contains competent, substantial evidence of reliability of the challenged methodology sufficient to support the hearing officer's findings of fact and approval of DNR's use of the "static and dynamic wave setup" theory. This methodology was verified by DNR against an actual storm of record, i.e., Hurricane Frederick. Dr. Dean testified that it was his understanding that the Academy of Sciences has never formally or informally addressed dynamic wave setup, contrary to the assertion of appellants' expert witness. Dr. Dean also testified that the theory has been accepted in a number of locations:
Q. Is dynamic wave set-up an experimental concept?
A. It is a rather new concept, but I certainly don't regard it as experimental.
It is  it has been documented by a lot of people in Japan, it has been documented by, very recently, by people at the coastal engineering field research facility, in Duck, North Carolina, Scripps Institute of Oceanography, many, many people have studied it. It is a well known concept and when a lot of people refer to it by different names, a lot of people call it surf beat when it occurs right on the shore.
(Vol. I, T. 110).
There being competent, substantial evidence in the record to support DNR's selection and use of the static and dynamic wave setup theory as a matter within the expertise of the agency, this point is insufficient *219 to require us to set aside the order validating the proposed rule amendment.

D.

WHETHER THE STATUTORY PREDICATE FOR THE REESTABLISHMENT OF THE CHARLOTTE COUNTY COASTAL CONSTRUCTION CONTROL LINE HAS NOT BEEN MET.
Section 161.053(2), Florida Statutes (1983), directs DNR to review and reestablish coastal construction control lines where hydrographic and topographic data indicate that shoreline changes have rendered the established lines ineffective. Under this point Island Harbor contends that DNR has exceeded its delegated legislative authority to reestablish the coastal construction control line in Charlotte County because the statutory predicate for reestablishing such line, i.e., shoreline changes that render established control lines ineffective, has been disproven by uncontroverted evidence that no net shoreline changes have occurred since the original line was set in 1977.
Island Harbor argues that, because the extent of erosion on the Charlotte county coast has been almost equally counterbalanced by accretion since 1977, there have been no "shoreline changes" rendering the 1977 line ineffective within the meaning of the statute. It further argues that the hearing officer erred in upholding DNR's right to justify changing the control line by reference to factors not contained in section 161.053(2), i.e., recently developed, more-accurate techniques for predicting the impact of 100-year storms, and changes to section 161.053 enacted subsequent to 1977. Island Harbor cites Department of Transportation v. Pan American Construction Co., 338 So.2d 1291 (Fla. 1st DCA 1976), app. dismissed, 345 So.2d 427 (Fla. 1977), for the proposition that an agency cannot, by rule, expand its statutory authority, and concludes that DNR has improperly done so by attempting to change the established control line when the changes required by statute as a predicate for such action had not occurred.
We have no quarrel with the abstract legal proposition for which the above case is cited. We find it inapplicable, however, to the facts in this case. The record contains competent, substantial evidence of erosion measured at approximately 40% of the range locations on the coast of Charlotte county, which justified DNR and the hearing officer's finding that substantial recession of the beach measured at mean sea level had occurred between 1974 and 1982, i.e., the mean sea level line moved closer to shore over 40% of the coastline. The record shows that the majority of the remaining coastline also experienced significant changes, such as accretion, erosion, or movement of the mean sea level line further seaward, which involved a net loss of approximately 59,000 cubic yards of beach material between 1974 and 1982. In view of this evidence we find Island Harbor's argument under this point unpersuasive.
As we construe section 161.053(2), Florida Statutes (1983), DNR need not demonstrate that every segment of the coastline has undergone an adverse change before it can review and determine that the established control line is not effectively fulfilling the statutory purpose; significant changes to a substantial portion of the coast are sufficient to warrant revisiting the entire line in a particular county.[9] Moreover, section 161.053(1) states that DNR shall establish control lines "on a county basis." There is no direct statutory authority for DNR to review and modify only select portions of a control line in a particular county except upon a specific request for modification by an affected riparian *220 upland owner. Section 161.053(2), Fla. Stat. (1983).
Nor is there any merit to Island Harbor's complaint regarding the hearing officer's apparent reliance on new advances in scientific methodologies and recent statutory changes. The evidence established that significant changes had occurred along at least forty percent of the coast and that these changes, standing alone, were sufficient to warrant reassessment of the effectiveness of the old line. That the validity of the proposed new line was judged in part on the basis of newer methodologies and more recent statutory provisions does not mean that the proper statutory predicate for reevaluating the control line in Charlotte County was not established. DNR is not constrained by section 161.053(2) to review the effectiveness of an old line solely on the basis of the scientific knowledge and methodologies existing when that section was enacted or the original line was set. Nor is DNR obligated to ignore statutory amendments during the intervening period if they are applicable to establishing the line at the time review is undertaken.

E.

WHETHER THE HEARING OFFICER'S SPECIFIC FINDINGS CONFIRM THAT THE PROPOSED COASTAL CONSTRUCTION CONTROL LINE IS ERRONEOUSLY PLACED ALONG THE SHORE OF CHARLOTTE COUNTY.
Island Harbor contends under this point that the location of the proposed control line is not supported by competent, substantial evidence because the hearing officer recognized in his supplemental findings that DNR's predicted storm water elevation was 1.2 feet too high and the uncontradicted evidence showed that this overestimation would severely impact the location of the control line, placing it too far inland.
More precisely, Island Harbor states that DNR used a storm surge elevation of 13 feet in calculating the landward invasion of a three-foot wave and that the hearing officer specifically found in his supplemental findings that DNR's estimate of the storm surge elevation was 1.2 feet too high. This overestimation, it says, had a significant impact on the predicted landward invasion of a three-foot wave, causing it to be located farther landward than if the correct elevation were used.
DNR does not dispute that the predicted storm surge elevation was overstated by an inflated figure for static and dynamic wave setup, but responds that the overestimation was not as great as 1.2 feet and that, in any event, there were factors not taken into account in estimating storm surge elevations that served to underestimate such elevations from 1.5 to 3 feet. Accordingly, DNR contends, the final storm surge elevation figure used by it was an accurate prediction supported by competent, substantial evidence.
The hearing officer's original order discussed the accuracy of DNR's estimate of storm surge elevation and found that conservative biases in DNR's methodology more than offset the 1.2 feet of overprediction caused by the figures used for static and dynamic wave setup. In particular, he found that "a documented phenomenon known variously as `initial rise,' `forerunner,' and `presurge anomaly' ... adds 1 to 3 feet to surge elevations, and that this factor would offset any diminished wave setup almost entirely." (Final Order, p. 15.) He further found that "the conservatism of DNR's methodology" is shown by actual historical storms, and that "the storm surge model has been calibrated against storms of record, which has demonstrated its reliability, whatever the merits of its theoretical underpinnings." (Final Order, p. 16.)
These findings by the hearing officer, being supported by competent, substantial *221 evidence in the record, effectively refute Island Harbor's argument that the 1.2 feet overestimation of wave setup rendered DNR's estimate of storm surge elevations invalid.

F.

WHETHER DNR'S UNPUBLISHED DEFINITION OF THE "BEACH-DUNE SYSTEM" IS AN INVALID RULE IN ITSELF AND CANNOT BE USED TO SUPPORT THE PROPOSED COASTAL CONSTRUCTION CONTROL LINE.
The essence of Island Harbor's argument under this point is that DNR's definition of the term "beach-dune system" amounts to an unpublished rule within the statutory definition of "rule." § 120.52(15), Fla. Stat. (1983). It says that DNR has failed to carry its burden of defending its definition as reasonable because the terms "beach" and "dune," as defined in DNR rules, relate to existing physical structures, whereas in defining the term "beach-dune system" DNR includes that portion of the coast that will be invaded by a three-foot wave, regardless of the present existence of beaches or dunes. This definition, says Island Harbor, amounts to an amendment of the rules defining "beach" and "dune" which must itself be adopted as a rule before it can become effective and be used.
It is well established that agency policy does not necessarily have to be adopted as a rule, but such nonrule policy must be explicated and defended in each proceeding in which it is relied upon. E.g., Barker v. Board of Medical Examiners, 428 So.2d 720 (Fla. 1st DCA 1983). An agency's definition of a statutory term not set forth in a duly promulgated rule may or may not constitute a "policy" statement, depending on the generality of the statutory language. In either event, the definition must not amount to an expansion of the agency's power beyond that authorized in the organic statute. E.g., Board of Optometry v. Florida Medical Ass'n, 463 So.2d 1213 (Fla. 1st DCA 1985), pet. for rev. denied, 475 So.2d 693 (Fla., 1985).
This argument relates to the appropriateness of DNR's construction of the statutory term "beach-dune system," which we previously examined extensively in points II-A and II-B, supra. We there concluded that the definition applied by DNR and the hearing officer did not extend beyond the intent of the statute and the agency's delegated authority. There has not been cited to us, nor have we found, any statute or judicial decision imposing a requirement that the agency's definition of a statutory term must be duly adopted as a definitional rule before it may be used in an administrative proceedings. See Barker v. Board of Medical Examiners, 428 So.2d at 722-23. We find no merit to this point.

G.

WHETHER THE HEARING OFFICER'S RULING DEMONSTRATES THE APPLICATION OF THE EROSIONAL MODEL TO BE AN OVERPREDICTION OF THE IMPACT OF A 100-YEAR STORM.
Under this point Island Harbor argues that DNR exceeded its delegated legislative authority as evidenced by the hearing officer's supplemental finding that "the use of the 2.5 multiplier to set the proposed coastal construction control line based on predicted erosion, results in overpredicting erosion from a 100-year storm event in 98% of the locations." This issue has been adequately covered by our previous discussion and is wholly without merit.

III.

SUNSET REALTY'S APPEAL
We now turn our attention to the following two points on appeal raised by Sunset Realty.

*222 A.

WHETHER THE LOCATION OF THE NEW CHARLOTTE COUNTY COASTAL CONSTRUCTION CONTROL LINE WAS NOT IN ACCORDANCE WITH SECTION 161.053(1), FLORIDA STATUTES, AND IS, THEREFORE, AN INVALID EXERCISE OF DELEGATED LEGISLATIVE AUTHORITY.

B.

WHETHER THE RULE ESTABLISHING THE NEW CHARLOTTE COUNTY COASTAL CONSTRUCTION CONTROL LINE IS INVALID BECAUSE THE FINAL ORDER FAILS TO SUPPORT AND EXPLAIN DNR'S DECISION TO APPLY THE THREE-FOOT WAVE CRITERION TO SET A SUBSTANTIAL PORTION OF THE CHARLOTTE COUNTY COASTAL CONSTRUCTION CONTROL LINE.
These points primarily present variations of the arguments discussed in Island Harbor's appeal. They are discussed jointly because the critical elements of both center around DNR's use of the three-foot wave criterion in establishing the coastal construction control line. In essence, Sunset Realty contends that DNR's use of the three-foot wave is an invalid exercise of delegated legislative authority because it results in the establishment of the proposed control line landward of the zone of severe fluctuation of the beach-dune system. It further argues that the methodologies used by DNR to establish the proposed control line are, in fact, unpublished rules and that, since DNR has chosen to adopt these methodologies as non-rule policy, it must explicate and defend its policy, including its use of the three-foot wave methodology, but has failed to do so.
More specifically, Sunset Realty states that the record lacks competent, substantial evidence to prove that the three-foot wave criterion used in setting the control line at ranges 16 through 68 is an accurate indicator of that portion of the beach-dune system subject to severe fluctuations in the event of a 100-year storm. It bases this contention on what it characterizes as "unrebutted testimony" of DNR's expert coastal engineer, Dr. Dean, that the control line based on the three-foot wave criterion is actually well landward of the area of severe fluctuation to the beach-dune system. The testimony of Dr. Dean, Sunset Realty says, established that, in his opinion, where the proposed control line established by the three-foot wave was landward of the proposed control line established by the Kriebel model, that portion of the beach-dune system landward of the Kriebel model line would not be subject to "severe fluctuations" as a result of a 100-year storm. Yet section 161.053 requires the control line to be established "so as to define that portion of the beach-dune system which is subject to severe fluctuations based on a 100-year storm surge."
Sunset Realty also argues that the testimony of Dr. Chiu, relied on by DNR and accepted by the hearing officer, is predicated on the mistaken impression that the purpose of the control line is to define that portion of the beach-dune system subject to "severe impact," including damage to structures on the beach-dune system. It contends that his testimony is not competent to establish that a three-foot wave will cause "severe fluctuations" to the beach-dune system, but establishes only that a three-foot wave will cause damage to upland structures.
These arguments have been answered in substantial part by our discussion of Island Harbor's points on appeal. In addition, we note that the hearing officer correctly pointed out that Dr. Dean's testimony was not entirely "consistent." Dr. Dean testified that a three-foot wave will move substantial quantities of sediment and that he felt it reasonable to use the three-foot wave to establish the proposed control line. He also testified, however, in a somewhat confusing exchange of questions and answers, that severe fluctuations will not occur landward of the line based on the Kriebel Erosion Model in those locations where the three-foot wave line is landward of the *223 Kriebel erosion line. In light of this apparent inconsistency, the hearing officer credited Dr. Chiu's testimony over that of Dr. Dean, commenting that although Dr. Chiu did not specifically testify that a three-foot wave would cause "severe fluctuations to the beach-dune system," the import of his testimony clearly established that a three-foot wave would, in fact, cause such severe fluctuations. The hearing officer noted that even Dr. Dean admitted that a substantial quantity of sand would be redistributed by a three-foot wave.
We hold that the hearing officer's findings on these disputed issues are supported by competent, substantial evidence. The hearing officer did not abuse his discretion in crediting the testimony of Dr. Chiu and concluding, based upon that testimony, that DNR's use of the three-foot wave criteria was appropriate.
Nor do we find any merit to the argument that DNR's use of the four "determining criteria" and the scientific methodologies was improper as an invalid use of unadopted rules. DNR's expert testimony established that all seven statutory criteria were considered, along with the "four determining criteria," in establishing the control line. DNR has satisfactorily explicated the basis for its use of those criteria, the Kriebel Erosion Model, and the three-foot wave as previously discussed under Island Harbor's appeal.

V.

CONCLUSION
To summarize, we approve the definition of "beach-dune system" applied in this case as not exceeding the intent of the statutory language used in section 161.053, Florida Statutes (1983). DNR's selection and use of the challenged scientific methodologies lies within its statutorily delegated authority and discretion. These methodologies are reasonably related to the statutory purpose and have been adequately explicated and defended by DNR. The failure to formally adopt DNR's methodologies and the "determining criteria" as a rule does not invalidate their use in this rulemaking proceeding, where they were open to challenge by appellants. The facts as found by the hearing officer are supported by competent, substantial evidence, and application of the methodologies to these facts has not resulted in DNR's setting the coastal construction control line more landward than permitted by section 161.053. Therefore, the order upholding the proposed amendment to rule 16B-26.06 must be affirmed.
The complexity of the scientific and technical issues in this case and the consequent deference necessarily given to DNR's expertise vividly illustrate the limited role an appellate court can play in resolving disputes arising out of an administrative agency's exercise of delegated discretion in respect to technical matters requiring substantial expertise and "making predictions ... at the frontiers of science." Carstens v. Nuclear Regulatory Comm'n, 742 F.2d 1546, 1577 (D.C. Cir.1984), quoting Baltimore Gas & Electric Co. v. Natural Resources Defense Council, 462 U.S. at 103, 103 S.Ct. at 2255 (1983). It has become clear to us, and probably apparent to the reader of this opinion, that the setting of coastal construction control lines for the purpose of adequately protecting the beaches and dunes of this state is not a matter of scientific certainty. The legislature's use of scientific terms and words of art in the organic statute, without setting forth more precise definitions, has compelled us to accord considerable  if not extraordinary  deference to DNR's interpretation of these terms and its selection of scientific techniques and methodologies to be employed in carrying out its statutory responsibilities.
The new coastal construction control line which we hereby approve will, at many locations along the Charlotte County coast, subject most of, and sometimes the entire, land mass of the barrier islands to regulation by DNR under section 161.053, Florida Statutes (1983). The line is not set at dunes immediately adjacent to the beach front. Appellants' right to use and erect structures upon the land they privately *224 own may be seriously circumscribed in many of the areas covered by the amended rule. Evaluation of the economic, environmental, and geophysical concerns underlying the wisdom and desirability of so regulating land use along Florida beaches is, however, a political matter for determination by the legislature, not this court. The setting of a truly desirable and effective coastal construction control line along almost any segment of the Florida coastline will inevitably involve mixed consideration of scientific knowledge and political concerns. Although the 1985 amendment allocating the task of reestablishing these control lines to the Governor and Cabinet (see note 1, supra) will afford some means of blending these considerations in a particular situation, the legislature itself must periodically review the lines set under this legislation and make specific changes as needed to insure that the agency, the Cabinet, and the courts are accurately discerning and applying the true statutory intent.
AFFIRMED.
SHIVERS and WENTWORTH, JJ., concur.
NOTES
[1] In 1985 the legislature amended section 161.053, Florida Statutes, to provide a new procedure for adoption of coastal construction control lines. This new procedure requires, inter alia, a public hearing before the Governor and Cabinet prior to formal adoption of the proposed control line, and specifically provides for the availability of administrative challenge through section 120.56, Florida Statutes (1983). Ch. 85-55, § 33, Laws of Fla.
[2] This group of appellants includes, in addition to Sunset Realty Corp., the following: Sunset Sands, Inc.; Sunset Mainland Corp.; Sunset Harbor, Inc.; Sunset Gulf Corp.; and Boca Grande Club, Inc.
[3] This group of appellants includes, in addition to Island Harbor Beach Club, Ltd., the following: Palm Island Village Property Owners Association, Inc.; Palm Island Village II Property Owners Association, Inc.; Charlotte Harbor Land Company Inc.; Mary Heuberger; Richard Morris; Richard Hall; Robert L. Taylor; Dr. Orlando Hudson; George Swartz; Robert Coulter; Richard Beauchamp; William Guthrie; Wally Ryerson; William Mackey; Bernardo Arenas, Jr.; Wayne Ator; Carl Frank; David Combs; Goldie Manley; Nabob of Florida, Inc.; Fred G. Shaller & Company, Inc.; Joseph Ellis; Albert S. Ellis, Jr.; Rena Wallace; Palm Island Investments Corp.; Mr. and Mrs. Robert Marks; Dr. James Grinaber; Dr. Charles Neubauer; Mark Shevitski; Anthony Linguanti; C. Guy and Deborah Batsel; and Steven C. Bush.
[4] These rulings have been exceptionally helpful in understanding the issues and arguments in this truly complex case, which involves 17 volumes of pleadings and transcripts and two large boxes of exhibits.
[5] The term "100-year storm" is defined in DNR rules as "a shore-incident hurricane or any other storm with accompanying wind, wave, and storm surge intensity having a one-percent chance of being equaled or exceeded in any given year." Fla. Admin. Code Rule 16B-33.02(16).
[6] "`Beach' is the zone of unconsolidated material that extends landward from the mean low water line to the place where there is marked change in material or physiographic form, or to the line of permanent vegetation (usually the effective limit of storm waves). Unless otherwise specified, the seaward limit of a beach is the mean low water line. Beach is alternatively termed the `Shore.'" Fla. Admin. Code Rule 16B-33.02(3).

"`Dune' is a mound or ridge of loose sediment, usually sand-sized sediment, lying upland of the beach or shore, and deposited by any natural or artificial mechanism (e.g., dune may also include a beach ridge, dune ridge, chenier, etc.)." Fla. Admin. Code Rule 16B-33.02(9). A "chenier" is defined in Webster's Third New International Dictionary of the English Language (unabridged, 1981) as "a wooded ridge or sandy hummock in a swampy region."
[7] The Greenberg decision dealt with the issue of whether the Florida State Board of Dentistry had been statutorily granted a power that it was attempting to exercise, i.e., the issuance of a subpoena during the pendency of an investigation. The instant case, however, does not present the issue of DNR's lack of any statutory power to act in this case but, rather, the issue of whether DNR has utilized a reasonable means to fulfill its statutory authority. We perceive a material distinction between these two issues.
[8] Application of this standard of appellate review of an agency's use of scientific methodology in furtherance of their delegated legislative authority, while paying deference to agency expertise, nevertheless does not dispense with the requirement that the agency adduce competent, substantial evidence of the reliability of the selected methodology; otherwise, the use of the methodology would undoubtedly be considered arbitrary and capricious.
[9] We note that in 1985 the legislature added a new subsection (3) to section 161.053 which directed that established coastal construction control lines not updated since June 30, 1980, will be treated as a "critical priority for reestablishment by the department." Ch. 85-55, § 33, Laws of Fla. This serves to confirm the legislative intent underlying the review authority in subsection (2) that such lines be periodically reviewed for effectiveness and reestablished.