# EVERGLADES PIPE LINE COMPANY v DEPARTMENT OF ENVIRONMENTAL REGULATION

## Case Nos. 87-5374 and 87-5305

State of Florida, Division of Administrative Hearings

June 17, 1988

### APPEARANCES OF COUNSEL

**Richard A. Pettigrew, Luis R. Figueredo,** for petitioner.

**E. Gary Early,** for respondent.

## OPINION OF THE COURT

DON W. DAVIS, Hearing Officer.

### RECOMMENDED ORDER

Pursuant to notice, the above matter was heard before the Division of Administrative Hearings by its duly designated Hearing Officer, Don W. Davis, on April 28, 1988 in Miami, Florida.

### BACKGROUND

The Respondent administers the Inland Protection Trust Fund and provides reimbursement to eligible applicants for certain expenses associated with site clean up of environmental contamination resulting from storage of petroleum and petroleum products. The reimbursement program was established in the State Underground Petroleum Environmental Resonse (SUPER) Act of 1986, and is codified in section 376.3071(12), *Florida Statutes.*

The Respondent denied reimbursement eligibility for facilities at two of Petitioner's sites on the basis that neither facility constituted a petroleum storage system as defined in section 376.301(11), *Florida Statutes.* In each instance of denial, the Petitioner requested a formal administrative hearing. This consolidated hearing on both denials followed.

Prior to the hearing, argument of the parties was heard regarding the Petitioner's *Motion in Limine.* In summary, the motion was a response to the Respondent's counsel's assertion to the Petitioner, less than a week before the hearing, that Petitioner must show contamination of the Petitioner's sites from leakage of Petitioner's tanks as part of a "prima facie case." Petitioner was expected to bear the "burden of proof" with regard to this additional issue.

The original basis for Resondent's denial was that the Petitioner's facilities were deemed not to be petroleum storage facilities within the context of the statutory definition set forth in section 376.301(11), *Florida Statutes.* Therefore, the Petitioner's motion sought to have the hearing restricted solely to the reasons set forth in Respondent's denial letters of May 19 and October 18, 1987, and prohibit the Respondent from even referring to any additional grounds for denial not previously explicated in accordance with subparagraph 3 of subsection 376.3071(12)(f), *Florida Statutes,* which provides in pertinent part that:

> Final disposition of an application shall be provided to the applicant in writing accompanied by a written explanation setting forth in detail the reason or reasons for the approval or denial.

The motion of Petitioner was denied. The Respondent's counsel was

**217**

instructed that evidence could be presented or elicited by the Respondent regarding the contamination issue, provided that Petitioner would only be required to go forward with evidence in response to the reasons set forth in the letters of denial.

At hearing, the Petitioner presented testimony of two witnesses. Petitioner also introduced exhibits 1-8; composite exhibit 11, which consists of subparts (A) through (S); and exhibits 12-19, 23, and 26-32. The Respondent presented testimony of two witnesses. Proposed findings of fact submitted by the parties are addressed in the appendix to this recommended order.

Based upon all of the evidence, the following findings of fact are determined:

## FINDINGS OF FACT

The parties stipulated at hearing to the factual findings set forth in paragraphs 1-5 below.

### Stipulated Facts

1. The Petitioner has four underground tanks. Two tanks are located at Petitioner's facility in Port Everglades and two tanks are located at Petitioner's facility in Miami International Airport. All four tanks are registered as "stationary tanks" with Respondent.

2. The Petitioner filed a request for reimbursement with the Respondent pursuant to section 376.3071(12)(b), *Florida Statutes.*

3. The Respondent's denial with regard to the facility at each site was based on " . . . the fact that this facility is not a petroleum storage system as defined in section 376.301(11), *Florida Statutes.*"

4. Subsequent to the Respondent's denial of the Petitioner's application, the Respondent conducted an additional inspection of the Port Everglades site.

5. The Petitioner timely filed a petition for a formal administrative hearing in response to Respondent's denial.

### Other Facts

6. Petitioner, Everglades Pipeline Company, is a single, unified pipeline facility. The sole purpose of the system is to transport petroleum product along a route from a receiving pumping station at Port Everglades via a 35 mile pipeline to various terminals and ending at a terminal at the Miami International Airport. The pipeline facility transports 400 to 3000 barrels of petroleum product per hour. The

petroleum product transported by Petitioner usually consists of jet A turbine fuel, JP-4 military fuel and railroad diesel fuel.

7. Various pipe lines, not owned or operated by Petitioner, transport petroleum product from major petroleum companies to the Petitioner's receiving station at Port Everglades where the product enters the Petitioner's pipe line facility. The process of placing the petroleum product in the care of Petitioner is known as a "custody transfer." While the product is in Petitioner's custody for purpose of transport to its destination, ownership of the product does not change. At all times, the product remains the property of the company acquiring the Petitioner's transportation service.

8. After transfer to the Petitioner's custody and during the transportation process, tests are constantly performed on the product for the purpose of maintaining quality control. During the testing process, an amount of the petroleum product is withdrawn from the pipeline through a one fourth inch pipe. Samples for testing purposes are then taken from the quantity of the product so removed. The excess of that quantity is channeled to two undergrounds tanks at the Everglades station and temporarily held there for later injection back into the pipeline for delivery, with the same batch of product from which it was drawn, to the recipient at the other end of the pipeline journey.

11. In the Miami station, the same process of withdrawal of a quantity of the product occurs, with two undergrounds tanks there fulfilling the same holding function as that performed by the tanks at the Port Everglades facility.

12. While each of the four tanks have been registered as required by section 376.301(11), *Florida Statutes,* such registration is not deemed dispositive of whether the tanks are petroleum storage systems since registration are accepted at face value by the Respondent and no independent verification of registration is made.

13. The two tanks at the Everglades facility have a 2100 gallon, or approximately 50 barrel, capacity. The two tanks at the Miami facility have a 1764 gallon capacity.

14. These four tanks, known as "sump" tanks, perform other functions in addition to temporarily holding amounts of product from which samples are taken. Strainers in the pipeline sometimes become clogged from impurities in the product being transported. When this happens, the product is back washed within the pipeline through the strainers to unclog them. The product used in this back wash operation is then cleansed and placed in the tanks for subsequent re-injection in the pipeline with the batch of product from which it originated. The

**219**

contaminants are placed in a strainer tank. The strainer tank is necessary for the effective operation of the pipeline. It was conceded in testimony of Petitioner's witness at hearing that this tank is not a petroleum storage system.

15. Maintenance of the system sometimes requires the draining of product from the pipeline into the sump tanks. As soon as the maintenance is completed, the product is re-injected into the pipeline with the batch from which it was drawn. A safe pipeline system requires the existence of the sump tanks to hold maintenance drainage material.

16. The tanks at the Port Everglades station are also used to hold product when pressure builds up in the pipeline system from thermal causes or other conditions which require that pressure in the system be relieved. The product drawn off at these times is re-injected in the pipeline into the batch of product from which it originated. Some form of pressure relief is necessary for safe and effective operation of the pipeline system.

17. The process of reinserting the product back into the pipeline is a manual operation to the extent that personnel are required to open certain valves. The product is not automatically re-injected. However, the sump tanks exist solely to "take care of the individual stations or terminal." While possible to operate the pipeline without the tanks, there is no use or purpose for them except as part of the pipeline facility.

18. An additional tank exists at the Port Everglades station as part of a scavenger system for recovery of product from the ground, but no evidence was presented to show the tank was stationary or registered. The tank is not a petroleum storage system pursuant to section 376.301(11), *Florida Statutes.*

19. In addition to the two sump tanks, two barrel shaped tanks sit above the ground at the Miami International Airport terminal. These tanks have the capacity to hold 1000 barrels or 42,000 gallons of petroleum product. Neither of these tanks is registered with the Department, nor was evidence introduced that they were otherwise licensed or comply with petroleum storage system requirements of section 376.301(11), *Florida Statutes.*

20. These barrel tanks were identified at hearing as a relief tank and a settling tank. The relief tank serves the same purpose of providing pressure relief for the system as do the sump tanks at the Port Everglades station. As with the sump tanks, the product is re-injected into the pipeline as soon as the upset condition causing over pressuriza-

tion is past. The tank also serves to hold certain types of contaminated product until the owner can remove it from the system.

21. The other barrel tank at the Miami station is used as a "settling" tank to filter contaminants from petroleum product. This tank is a treatment or process tank, as opposed to a petroleum storage system.

22. The barrel tanks at the Miami station, like the sump tanks there and at the Port Everglades station, serve only the product transportation function of the pipeline. They are necessary for safe and effective functioning of that transportation system.

23. Each of the Petitioner's tanks is integrally related to the transportation of product from Port Everglades to Miami. Their sole purpose is to the safe and effective functioning of the pipeline. As established by testimony of John Svec, Respondent's expert on petroleum storage facilities, the Petitioner's tanks function for the convenience of the transportation system. The process of taking the product out of the pipe line, holding it, and putting it back into the pipe line is a transportation function.

24. While the Petitioner's tanks temporarily hold petroleum product, they do not store that product in order to provide a supply for future use within the context of that term's use in the field of petroleum marketing. The term "supply" means the buying or selling of product. The Petitioner does not engage in buying and selling. Custody of materials is assumed solely for transportation of that material by the Petitioner's facility. The holding function of the tanks is a part of the overall purpose of the entire pipeline facility to transport petroleum product.

25. Petitioner's exhibit 11 establishes that the original Senate version (Senate Bill 206) of the SUPER Act of 1986 made no mention of pipeline facilities for purpose of inclusion under coverage of the Act. The committee substitute for Senate Bill 206 did not include pipelines. This inclusion was carried over to the committee substitute for the committee substitute, only to be deleted from the final enrolled version of the Act.

### CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the subject matter of this proceeding, and the parties thereto, pursuant to subsection 120.57(1), *Florida Statutes.*

The State Underground Petroleum Environmental Response (SUPER) Act of 1986 was enacted to provide for the expeditious cleanup of property contaminated as a result of the storage of petroleum or

221

petroleum product. Chapter 86-159, *Laws of Florida* (1986). The Act recognizes the vulnerability of Florida's groundwater to contamination and provides several mechanisms by which cleanups of contamination resulting from storage of such products may be funded. Sections 376.30(1), and 376.3071(1), *Florida Statutes.* The purpose of programs under the Act is to avoid delays in cleanups as a result of litigation and liability determinations.

As part of the Act, the legislature created the reimbursement program which is the subject of this litigation. In section 376.3071(12), *Florida Statutes,* provision is made for the reimbursement by the state of costs incurred in the cleanup of sites contaminated as the result of storage of petroleum or petroleum product. To be eligible for reimbursement of such costs, the applicant must maintain a "petroleum storage system" in accordance with the following definition in subsection 376.301(11), *Florida Statutes:*

"Petroleum storage system" means a stationary tank not covered under the provisions of chapter 377, together with any onsite integral piping or dispensing system associated therewith, which is used, or intended to be used, for the storage or supply of any petroleum product as defined herein, and which:

(a) Is registered with the Department of Environmental Regulation under this chapter or any rule promulgated pursuant hereto;

(b) Is located in a terminal facility registered with the Department of Natural Resources under this chapter or any rule promulgated pursuant hereto;

(c) Is located in a storage facility licensed with the Department of Revenue under § 206.022 or § 206.9930, excluding offsite pipelines;

(d) Is a system with respect to which notification has been submitted to the Department of Environmental Regulation under § 376.303; or

(e) Is a system with respect to which notification has been submitted to the appropriate state agency under Subtitle I of the Resource Conservation and Recovery Act.

The Respondent, under the provisions of Chapter 376, *Florida Statutes,* is charged with responsibility for implementing and administering the reimbursement program. In the exercise of that responsibility, the Respondent has determined that the Petitioner's facility is a transportation facility as opposed to a storage facility, thereby rendering Petitioner ineligible for reimbursement.

The Petitioner contends that since the sump tanks at the Everglades and Miami facilities are registered, they should be deemed to meet the

definitional requirements set forth above and thereby permit reimbursement of clean up expenses at the Port Everglades and Miami terminals.

The tank facilities operated by the Petitioner do not comport with the aforementioned statutory definition in its requirement that an eligible system be one "used, or intended to be used, for the storage or supply" of petroleum product. The Petitioner's system is not a "storage" system. It is a part of a transportation system. In the very same sense, the four sump tanks do not comprise a supply system for the Petitioner's pipeline facility since each tank may only temporarily hold relatively minute quantities (approximately 50 barrels maximum) of product from which testing samples have been taken, as opposed to the voluminous amount of product needed to meet the transport capability (approximately 3000 barrels per hour) of the Petitioner's pipeline. A supply is an "available aggregate of things needed or demanded." See, Blacks Law Dictionary, 4th Edition, 1957. Further, if "supply" is intended by the statute to be used in the context of business dealings, the facts adduced at hearing establish that providing a supply of product within the petroleum industry involves buying and selling. As established at the hearing, the Petitioner does not buy or sell the product, but merely transports it.

A plain reading of the statutory definition does not reveal that pipeline facilities of the type operated by the Petitioner are eligible recipients for reimbursement. The Petitioner would urge the conclusion in this instance that a pipeline is "integral piping" of 35 miles, carrying a volume of product ranging from 400 to 3000 barrels per hour, which should qualify a tank, temporarily holding 50 barrels or less, as a "petroleum storage system." Such a contention is not, however, persuasive. If the legislature intended the inclusion of pipeline transportation facilities within the subject definition, it would have so stated. In fact, the contrary is clearly indicated by the exclusion of pipelines from the final legislative version. The legislature's "deliberate use of a quite different term . . . is strong evidence indeed that it intended a quite different meaning." *Ocasio v Bureau of Crimes Compensation, Division of Workers Compensation,* 408 So.2d 751 (Fla. 4th DCA 1982).

The legislative use of the word "system" indicates that a review of the overall system of an applicant under consideration is appropriate. *See, Island Harbor Beach Club Ltd. v Department of Natural Resources,* 495 So.2d 209 (Fla.. 1st DCA 1986). When considering whether a piece of equipment is a storage system, the Department is justified in evaluating the overall purpose of the system or facility as opposed to viewing an individual component in isolation. Here, the proof establishes that the Petitioner's system is a unified mechanism for

**223**

the transportation of petroleum product, not storage. The sump tanks, but for their service to the transportation system, would serve no purpose whatsoever. Agency exercise of delegated legislative authority should not be overturned unless shown by a preponderance of the evidence to be arbitrary, capricious or an abuse of discretion. *Island Harbor,* at 218; *Agrico Chemical Company v Department of Environmental Regulation,* 365 So.2d 759 (Fla. 1st DCA 1979).

The legislature clearly distinguishes "storage" from "transportation" as evidenced by the separate enumeration of those terms in subsection (2) and (3) of section 376.30, *Florida Statutes.* Given this legislative distinction, the Respondent has acted reasonably in determining the types of systems which fall within the ambit of section 376.3071, *Florida Statutes. See, Ocasio, supra.* The Respondent's consideration of the type of system involved is not arbitrary, capricious or an abuse of discretion, since Petitioner's system is a means of transport of fuel between Port Everglades and Miami, and since the sump tanks are essential to the effective operation of that system.

Notably, only the four sump tanks meet the threshold burden of registration, license or notification filing as required by section 376.301(11), *Florida Statutes.* Therefore, cleanup of discharges associated with the scavenger tank, the above-ground tanks and any other tanks at Petitioner's terminals are not eligible for reimbursement consideration.

The construction given to Chapter 376, *Florida Statutes,* by the Respondent is entitled to great deference and should be upheld unless clearly erroneous. *Department of Insurance v Southeast Volusia Hospital District,* 438 So.2d 815, 820 (Fla. 1983).

The Respondent's construction of the term "petroleum storage system" in section 376.301(11), *Florida Statutes,* to exclude the Petitioner's transportation sump tanks is adequately supported by the record in this proceeding. The determination to exclude the Petitioner's tanks from that statutory definition has a reasonable and rational basis.

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, it is

RECOMMENDED that a final order be entered denying the Petitioner's application for reimbursement eligibility.

DONE AND RECOMMENDED this 17th day of June, 1988, in Tallahassee, Leon County, Florida.